[No. E029416. Fourth Dist., Div. Two. Oct. 10, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES CLENZO BURRIS, JR., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

## Counsel

Maureen J. Shanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Warren P. Robinson and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

RICHLI, J.—Defendant James Clenzo Burris, Jr., appeals from a judgment ordering him civilly committed as a sexually violent predator. He contends there was insufficient evidence that he lacked control of his sexually violent behavior. Alternatively, he contends that, if there was any such evidence, it was elicited by his counsel on cross-examination, and therefore his counsel rendered ineffective assistance. Finally, he contends the deputy district attorney committed misconduct in closing argument.

In the published portion of this opinion, we will hold that the People, on direct examination, elicited sufficient evidence of lack of control. We therefore do not reach defendant's alternative contention regarding ineffective assistance of counsel. In the unpublished portion of this opinion, we will hold that the deputy district attorney's remarks did not constitute misconduct; that defendant waived his claim to the contrary; and that, in any event, the supposed misconduct was not prejudicial. Accordingly, we will affirm.

I

STATEMENT OF FACTS

A. *Defendant's Background.*

Defendant had borderline mental retardation, with an IQ of 65 to 70, and a hearing impairment.

When he was 10 or 11 years old, defendant had a juvenile adjudication for "essentially a rape" of an eight- or nine-year-old girl. He was placed on probation. When he was 13 or 14, he had another juvenile adjudication for "a similar offense." Once again, he was placed on probation.

B. *Defendant's Qualifying Offenses.*

1. *Rape of C.L.*

In July 1981, C.L. was home alone with her 16-month-old daughter when there was a knock at the door. When she opened the door, she found defendant, wearing a ski mask and holding a gun and a screwdriver. He "pushed himself inside the door . . . ." He told her to shut up or he was going to kill her. After a struggle, during which he poked her with the screwdriver, he pushed her to the floor and raped her. When he was done, he asked her for money. She gave him $5 in cash, which was all she had. Before leaving, he told her "not [to] tell anybody or he would come back and get [her]."

2. *Attempted Rape.*

In August 1981, defendant knocked on another woman's door, then forced his way in. He was armed with a screwdriver. He was in the process of forcing the woman into the bedroom when her husband arrived. Defendant then fled.

3. *Rape of S.M.*

In October 1981, S.M. was walking to her car in a school parking lot at night when defendant "attacked [her] from behind." He held a knife up

against her stomach. He asked her where her car was. She tried to grab the knife, but it cut her thumb "to the bone." She screamed. Defendant "put his hand over [her] mouth," "brought the knife up to [her] throat" and "told [her] not to scream again and not to do anything because if [she] did, he would shut [her] up." Defendant forced her to walk to some bleachers. Once there, he told her to take off her clothes. After she did so, he put down the knife, got undressed, and raped her. When he left, he told her, "You stay right there and don't you move."

### 4. *Conviction and Imprisonment.*

In July 1981, based on the incident involving C.L., defendant was charged with rape, robbery, and burglary. While these charges were pending, he committed the attempted rape. In September 1981, he pleaded guilty to the rape of C.L.; the robbery and burglary charges were dismissed. While awaiting sentencing, he committed the rape of S.M. In October 1981, based on the incident involving S.M., he was charged with rape. In February 1982, he pleaded guilty to the rape of S.M.; he was sentenced on the two rapes to a total of six years in prison. Charges arising out the attempted rape were dropped.

Defendant displayed "a constant pattern of conflict with the prison rules." Within about a month, he received his first prison disciplinary citation; he continued to receive such citations throughout his time in prison. Most of them were for violent and/or gang-related behavior, including participation in a stabbing, attempted assault on a correctional official, possession of a weapon, possession of opiates, theft, destruction of state property, refusing orders, being out of bounds, improper use of food and "inappropriate sexual behavior." In one incident, while facing a female correctional officer, he grabbed his genitals and "massag[ed] them." While in prison, defendant was convicted of possession of a weapon and sentenced to an additional three years.

In 1991, defendant was paroled. He violated his parole by stealing a car and by failing to register as a sex offender and was returned to prison.

In April 1993, defendant was paroled again. In November 1993, he lured a seven-year-old girl into his house, then took off her clothes, undressed himself, "and tried to put his private into her private." In May 1994, based on this incident, he was charged with lewd and lascivious conduct, a felony, and child molestation, a misdemeanor; he was also charged with possession of a firearm by an ex-felon. In July 1994, he pleaded guilty to firearm possession and to child molestation; the lewd and lascivious conduct charge

was dropped. He was sentenced to a total of six years in prison. Had he been convicted of the lewd and lascivious conduct charge, it would have constituted a third qualifying offense.

### C. *Testimony of Dr. Kania.*

Dr. Michael Kania, a clinical psychologist, had done some 25 to 30 sexually violent predator evaluations. In a little over half of these, he had concluded that the subject was a sexually violent predator.

In March 1997, Dr. Kania had evaluated defendant. As part of this evaluation, he had interviewed him.

Defendant claimed the girl he had raped as a juvenile was not nine years old; rather, she was in the ninth grade. He also said, "I didn't rape her. I talked her into it." He said this girl was his girlfriend, and she appeared to be 12 or 13 years old. He claimed he only kissed the second girl.

Defendant was age 18 when he committed the 1981 rapes. Regarding the July 1981 rape of C.L., defendant said the rape was actually committed by another person who was with him. Regarding the October 1981 rape of S.M., defendant told Dr. Kania that "because he was young, he did a stupid thing . . . ." He had previously told another doctor he had seen *Roots*, a television mini-series based on the book by Alex Haley, in which a White man raped a Black woman, and it made him want to rape a White woman. He also said he had reneged on a promise to pay both victims in exchange for sex, and they had retaliated by falsely accusing him of rape.

Regarding the 1993 sexual molestation, defendant told Dr. Kania the victim was 15 years old and had a child of her own.

These explanations indicated "underlying dishonesty." Defendant was trying to deny or minimize his involvement. He did not show any remorse or any awareness that what he did was wrong.

Dr. Kania diagnosed defendant as having a paraphilia, defined as a deviant sexual attraction. In defendant's case, his paraphilia involved girls younger than he as well as rape.

Defendant also had an antisocial personality disorder. Dr. Kania defined this as "a pattern that continues past the age of 15 that . . . involves . . . illegal or antisocial behavior," such as robbery or "sexual misconduct." He testified that an antisocial personality disorder tends to be "entrenched"—a

"pattern of behavior that doesn't change even though the person may get in trouble with the law or may have some counseling and [be] told they are doing things the wrong way."

Defendant had no reasonable plan for the future. While on parole, he had not worked, except as a pimp. He did not feel he had any psychological problems, so he saw no need for treatment.

Dr. Kania concluded that defendant was likely to engage in sexually violent behavior if released. His opinion was based on the fact that defendant's history of "sexual acting[-]out" was "well[-]entrenched," having begun when he was age 10 or 11. There was no indication that he had ever had a successful sexual relationship; he had never been married or had a long-term relationship. Dr. Kania's opinion was also based on defendant's antisocial personality disorder. Defendant's lack of remorse indicated that he did not see his behavior as a problem. His failure to hold down a steady job indicated an increased likelihood of reoffending. His lack of long-term goals meant he was more likely "to act out impulsively," without considering the consequences.

D.   *Dr. Kania's Testimony on Cross-examination.*

Dr. Kania gave the following testimony on cross-examination and/or redirect examination.

A paraphilia affects volitional capacity because the person is likely to engage in inappropriate behavior as a result of his or her deviant sexual attraction. In Dr. Kania's opinion, defendant was unable to control his behavior due to his paraphilia. His opinion was based on the "repeated incidents where [defendant] engaged in that behavior, he was apprehended and punished and yet continued in that behavior." By contrast, a psychologically healthy person learns from experience and changes behavior which gets him or her in trouble.

An antisocial personality disorder which coexists with a paraphilia can lead to sexual recidivism because it involves a disregard for the law and a tendency to act impulsively. A meta-analysis of over 100 studies, however, had found only "a slight correlation" between antisocial personality disorder and sexual recidivism.

Mental retardation may or may not affect impulse control. Dr. Kania felt defendant's inability to learn from past mistakes was due to his antisocial personality disorder rather than to his mental retardation.

E. *Testimony of Dr. Miccio-Fonseca.*

Dr. L.C. Miccio-Fonseca, a "forensic sexologist," had done a sexually violent predator evaluation of defendant in March 1997. In connection with her evaluation, she had interviewed him.

In discussing the 1981 rapes, defendant told Dr. Miccio-Fonseca, "I was young and stupid. . . . I know I did it, but I don't know why. Maybe hostility toward women. I didn't pick them. It was just a woman there. . . . I didn't need no weapon. I used force with my physical strength . . . . I pushed her onto the ground. I didn't beat her, you know, how serial killers . . . cut their arms off. I didn't do that. I just forced them. That's all." This led Dr. Miccio-Fonseca to suspect that defendant fantasized about killing his victims. Defendant did not appreciate the seriousness of his behavior or the impact that behavior had on his victims.

Like Dr. Kania, Dr. Miccio-Fonseca diagnosed defendant as having a paraphilia involving rape and an antisocial personality disorder.

She concluded that defendant "would" engage in sexually violent behavior if released. Her opinion was based on his history of juvenile sexual offenses, his history of sexual offenses involving the use of a weapon and threats to kill the victim, his disciplinary violations while in prison, his gang membership, his history of drug use and abuse, his history of auditory hallucinations, his antisocial personality disorder, physical abuse in his family, and his probation and parole violations.

She testified that a rapist with defendant's history who is incarcerated and then released will reoffend within five years. Also, a person who is arrested for a sexual offense as a juvenile is likely to be arrested again.

F. *Dr. Miccio-Fonseca's Testimony on Cross-examination.*

Dr. Miccio-Fonseca gave the following testimony on cross-examination and/or redirect examination.

She had evaluated defendant using the rapid risk assessment for sex offense recidivism, or "RRASOR." He had scored a four. This meant he had a 32.7 percent risk of reoffending within five years and a 48.6 percent risk of reoffending within 10 years. However, she felt these figures were an underestimate.

Defendant's antisocial personality disorder was "unchangeable." A person with a paraphilia can try to manage it, through treatment, medication,

education or otherwise. For example, if defendant had rape fantasies, he could either choose to act them out or choose to prevent himself from acting them out.

### G.   *Testimony of Dr. Donaldson.*

Dr. Theodore Donaldson, a clinical and forensic psychologist, testified for the defense. He had been a member of the sexually violent predator panel for about three months; however, he had been terminated because "[his] views were not consistent with other people's views." Since then, he had done sexually violent predator evaluations exclusively for defense attorneys.

He agreed that "it is almost a certainty that [defendant] will continue to rape in the future." One study showed that, over a 25-year period, the average rapist had a 25 to 39 percent chance of being charged with a new offense and a 24 percent chance of being convicted. Dr. Donaldson agreed that defendant's RRASOR score was a four, indicating a 48.7 percent chance of reoffending within 10 years. Defendant's actual likelihood of reoffending was probably higher.

Dr. Donaldson disagreed, however, that defendant had a "mental disorder" within the meaning of Welfare and Institutions Code section 6600. The definition of "mental disorder" required an inability to control behavior.

Dr. Donaldson defined volitional control as the ability to make a choice. A person is volitionally impaired when a "driving force" overcomes his or her ability to make choices. "Most people who are compelled to behavior . . . go through some sort of concern afterwards. . . . [T]hey look pretty tormented about it." Such a person would feel remorse. The fact that a person repeats criminal behavior after being punished does not show volitional impairment; it shows only "risk-taking behavior."

According to Dr. Donaldson, defendant was not unable to control his behavior. Rather, defendant chose not to control himself. "He acts out whenever he wants to. . . . He has a strong sense of entitlement. He is angry. A lot of his crimes involve . . . a lot of anger and aggression." He was impulsive, but not compulsive. The fact that he had no qualms about his behavior meant that his volition was not impaired. An antisocial personality disorder was the antithesis of a volitional impairment.

## II

### THE SUFFICIENCY OF THE EVIDENCE
### OF LACK OF CONTROL

Defendant contends there was insufficient evidence that he lacked control of his sexually violent behavior. He asserts this contention in two

alternative forms. First, he argues that there was insufficient evidence of lack of control anywhere in the record. Second, he argues that the People's direct examination of their witnesses provided insufficient evidence of lack of control; accordingly, to the extent that his trial counsel elicited such evidence on cross-examination, defendant received ineffective assistance of counsel.

"[T]he Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq. (Act)) . . . provides for civil commitment of criminal defendants who, after serving their prison terms, are found to be 'sexually violent predator[s].' [Citation.]" (*People v. Torres* (2001) 25 Cal.4th 680, 682 [106 Cal.Rptr.2d 824, 22 P.3d 871], fn. omitted, quoting Welf. & Inst. Code, § 6604.)

To prove that defendant was a sexually violent predator, the People had to prove that: (1) he had been convicted of at least two sexually violent offenses against different victims, (2) he had a "diagnosed mental disorder" as defined in the Sexually Violent Predators Act (the Act), and (3) his mental disorder made it likely that, if released, he would commit sexually violent predatory crimes. (Welf. & Inst. Code, § 6600, subds. (a)(1), (c); *People v. Hurtado* (2002) 28 Cal.4th 1179, 187-188 [124 Cal.Rptr.2d 186, 52 P.3d 116]; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144-1145 [81 Cal.Rptr.2d 492, 969 P.2d 584].) " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (Welf. & Inst. Code, § 6600, subd. (c).)

As a matter of substantive due process, the federal Constitution does not permit the civil commitment of a recidivist violent sexual offender unless he lacks control of his sexually violent behavior. This "lack of control" requirement stems from *Kansas v. Hendricks* (1997) 521 U.S. 346 [117 S.Ct. 2072, 138 L.Ed.2d 501]. There, the United States Supreme Court stated: "A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a *volitional impairment* rendering them dangerous *beyond their control.*" (*Id.* at p. 358 [117 S.Ct. at p. 2080], italics added.)

The court then held that Kansas's sexually violent predator law met this standard: "The Kansas Act is plainly of a kind with these other civil

commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior. [Citation.]" (*Kansas v. Hendricks, supra*, 521 U.S. at p. 358 [117 S.Ct. at p. 2080].)

The court further held that Hendricks himself met this standard. He had pedophilia, "a serious mental disorder," and he admitted he could not control his urge to molest children. (*Kansas v. Hendricks, supra*, 521 U.S. at p. 360 [117 S.Ct. at p. 2081].) "This admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." (*Ibid.*)

In *Kansas v. Crane* (2002) 534 U.S. 407 [122 S.Ct. 867, 151 L.Ed.2d 856], the Supreme Court further refined the "lack of control" requirement. It stated that *Hendricks* had not required "*total* or *complete* lack of control. *Hendricks* referred to the Kansas act as requiring a 'mental abnormality' or 'personality disorder' that makes it '*difficult,* if not impossible, for the [dangerous] person to control his dangerous behavior.' [Citation.] The word 'difficult' indicates that the lack of control to which this Court referred was not absolute." (*Kansas v. Crane, supra*, 534 U.S. at p. 411 [122 S.Ct. at p. 870], quoting *Kansas v. Hendricks, supra*, 521 U.S. at p. 358 [117 S.Ct. at p. 2080].)

"We do not agree . . . , however, . . . that the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination." (*Kansas v. Crane, supra*, 534 U.S. at p. 412 [122 S.Ct. at p. 870].) "In [*Hendricks*], we did not give to the phrase 'lack of control' a particularly narrow or technical meaning. . . . [I]n cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. [Citations.]" (*Ibid.*)

The California Supreme Court has held that the California act meets the standard stated in *Hendricks*: "[T]he [Act] tracks the Kansas scheme verbatim in describing the requisite mental disorder as a 'congenital or acquired

condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.' [Citation.] Through this language, the Act targets sexual offenders who suffer from a diagnosed 'volitional impairment' making them 'dangerous beyond their control.' [Citation.] . . . .

"The [Act] also establishes the requisite connection between impaired volitional control and the danger posed to the public. Much like the Kansas law at issue in *Hendricks*, our statute defines a[] [sexually violent predator] as a person who has committed sexually violent crimes and who currently suffers from 'a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior.' [Citation.] Through this language, the [Act] plainly requires a finding of dangerousness. The statute then 'links that finding' to a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior. [Citation.] This formula permissibly circumscribes the class of persons eligible for commitment under the Act." (*Hubbart v. Superior Court, supra*, 19 Cal.4th at pp. 1157-1158, fn. omitted, quoting *Kansas v. Hendricks, supra*, 521 U.S. at p. 358 [117 S.Ct. at p. 2080].)

In this appeal, defendant urges essentially the same interpretation of the Act as Dr. Donaldson urged in his testimony below. That is, defendant argues that reoffending impulsively or without considering the consequences is distinguishable from reoffending due to lack of control. "Lack of control," he argues, "is more consistent with someone who knows and considers the consequences but is unable to stop . . . ."

We believe this is precisely the sort of "narrow or technical meaning" which the United States Supreme Court has specifically refused to give to "lack of control." The court focused on lack of control because this factor serves to distinguish those recidivist violent sexual offenders who should be dealt with civilly from those who should be dealt with criminally. As the court observed, "[T]he two primary objectives of criminal punishment [are] retribution or deterrence. The Act's purpose is not retributive because it does not affix culpability for prior criminal conduct." (*Kansas v. Hendricks, supra*, 521 U.S. at pp. 361-362 [117 S.Ct. at p. 2082].) "Nor can it be said that the legislature intended the Act to function as a deterrent. Those persons committed under the Act are, by definition, suffering from a 'mental abnormality' or a 'personality disorder' that prevents them from exercising adequate control over their behavior." (*Id.* at p. 362 [117 S.Ct. at p. 2082].)

It follows that a recidivist violent sexual offender who, due to a mental disorder, is unlikely to be deterred by the risk of criminal punishment lacks

control in the requisite sense. The criminal law is ill-equipped to deal with such an offender. First, it cannot act until he commits a new offense—which he must be expected to do, precisely because he is predisposed to offend and cannot be deterred. It cannot operate preventively; it is triggered only after he has imposed the costs of a new violent sexual offense on a new victim and on society. Second, it can act only through incarceration. As long as the offender is incarcerated, he is unlikely to seek or to receive treatment. Then, when he is released, the cycle of waiting for him to commit a new offense must start all over again. The civil law, by contrast, can operate prospectively and preventively. Moreover, a civil committee has an incentive to seek treatment, and the committing authorities have an incentive—indeed, an obligation—to provide it. (See Welf. & Inst. Code, § 6606, subd. (a).)

Certainly a person who does not want to rape, feels remorse after raping, yet continues to rape anyway, "lacks control." But a person who *does* want to rape, feels *no* remorse after raping, and continues to rape despite having been criminally punished for prior rapes, *also* "lacks control." This is so because neither offender is likely to be deterred by the risk of criminal punishment; thus, both should be dealt with civilly.

Defendant's proposed distinction between these two types of offenders poses certain practical problems. It depends almost entirely on expert witnesses' opinions regarding the offender's expressed subjective feelings. Thus, it is peculiarly subject to manipulation and mistake. It can be reduced to a philosophical debate about free will: Is an offender who expresses no remorse acting out of his own free will, whereas one who does express remorse is acting out of compulsion? (And what does this even mean, given that the mental disorder causing the compulsion is a part of the offender, not some outside force?) Or are both offenders acting out of their own free will, with the only real difference being in their subsequent feelings about their acts? An expert's testimony that there is (or is not) a distinction between these two types of offenders is likely to be dictated, not by the expert's evaluation of the particular offender in light of his or her education, training, and experience, but by his or her preexisting position on this philosophical issue.

In *Crane,* the Supreme Court held that the federal Constitution does not require an *absolute* lack of control precisely because this distinction is so difficult to draw: "[A]n absolutist approach is unworkable. [Citations.]" (*Kansas v. Crane, supra,* 534 U.S. at p. 411 [122 S.Ct. at p. 870].) The court quoted psychological authority stating that " ' "[t]he line between an irresistible impulse and an impulse not resisted is probably no sharper than that between twilight and dusk[.]" ' " (*Ibid.,* quoting American Psychiatric Association, Statement on the Insanity Defense (1982) 11, reprinted in Melton et

al., Psychological Evaluations for the Courts (2d ed. 1997) 200.) It added: "[M]ost severely ill people—even those commonly termed 'psychopaths'— retain some ability to control their behavior. [Citations.]" (*Crane, supra,* at p. 412 [122 S.Ct. at p. 870.)

The court also declined to decide whether civil confinement based solely on an "emotional" impairment, with no "volitional" impairment, would be constitutional. (*Kansas v. Crane, supra,* 534 U.S. at p. 415 [122 S.Ct. at p. 872].) It commented, however, that: " . . . *Hendricks* . . . did not draw a clear distinction between the purely 'emotional' sexually related mental abnormality and the 'volitional.' Here, as in other areas of psychiatry, there may be 'considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior.' [Citation.] Nor, when considering civil commitment, have we ordinarily distinguished for constitutional purposes among volitional, emotional, and cognitive impairments. [Citations.]" (*Ibid.* [122 S.Ct. at pp. 871-872], quoting American Psychiatric Association Statement on the Insanity Defense (1983) 140 Am. J. Psychiatry 681, 685.) This strongly suggests that, in the court's view, an offender who chooses to reoffend because, emotionally or cognitively, he has a "defective understanding or appreciation" of the consequences also "lacks control" in the requisite sense.

Finally, the court stated: "[O]ur cases suggest that civil commitment of dangerous sexual offenders will normally involve individuals who find it particularly difficult to control their behavior—in the general sense described above. Cf. *Seling* v. *Young,* 531 U.S. 250, 256 [121 S.Ct. 727, 731, 148 L.Ed.2d 734] (2001) . . . ." (*Kansas v. Crane, supra,* 534 U.S. at p. 414 [122 S.Ct. at p. 871].) In the cited portion of *Seling v. Young,* the court described the defendant there as follows: ". . . Young suffered from a severe personality disorder not otherwise specified with primarily paranoid and antisocial features, and a severe paraphilia, which would be classified as either paraphilia sexual sadism or paraphilia not otherwise specified (rape). [Citation.] In the state expert's opinion, severe paraphilia constituted a mental abnormality under the Act. The State's expert concluded that Young's condition, in combination with the personality disorder, the span of time during which Young committed his crimes, his recidivism, his persistent denial, and his lack of empathy or remorse, made it more likely than not that he would commit further sexually violent acts. . . . The jury unanimously concluded that Young was a sexually violent predator." (*Seling v. Young, supra,* 531 U.S. at p. 256 [121 S.Ct. at p. 731].) We can only conclude that the Supreme Court believed an offender can lack control even if he has an antisocial personality disorder and lacks remorse.

Defendant also argues that an antisocial personality disorder is not a "mental disorder" within the meaning of the Act. He points out that, when

the Act was originally introduced, it required a sexually violent predator to have either a "mental abnormality" or a "personality disorder." (Assem. Bill No. 888 (1995-1996 Reg. Sess.) § 3, as introduced Feb. 25, 1995.)[1] It defined "mental abnormality" essentially the same way as the Act now defines "mental disorder"; it did not define "personality disorder." (*Ibid.*) The Senate then amended the Act so as to change "mental abnormality" to "mental disorder" and to delete "personality disorder" entirely. (Sen. Amend. to Assem. Bill No. 888 (1995-1996 Reg. Sess.) § 3, July 17, 1995.)[2]

This particular amendment, however, was viewed as merely a "technical and clarifying change[] . . . ." (Assem. Floor Analysis, Concurrence in Sen. Amends. to Assem. Bill No. 888 (1995-1996 Reg. Sess.) as amended Sept. 12, 1995, p. 5.)[3] It seems most likely that it was intended to eliminate the anomaly that "mental abnormality" was defined but "personality disorder" was not. Thus, it was not intended to prevent a "personality disorder" from qualifying as a "mental disorder" within the meaning of the Act.

Defendant also argues that, if an antisocial personality disorder qualifies as a "mental disorder," the Act permits bootstrapping. His concern is that a defendant's prior sexual offenses may be the only basis for an expert's opinion that he has an antisocial personality disorder; this opinion, in turn, may be the only basis for the expert's further opinion that he lacks control. Defendant relies on Justice Werdegar's concurring opinion in *Hubbart v. Superior Court, supra,* 19 Cal.4th 1138, in which she expressed a similar concern. (*Id.* at pp. 1179-1181.) She concluded, however, that the case then before the court did not present any such issue. (*Id.* at p. 1181.) It therefore suffices to note that this case, likewise, does not involve any such arguably unconstitutional bootstrapping.

We turn, then, to the evidence in this case. While defendant was awaiting trial for the rape of C.L., he attempted to rape an unnamed victim. Thereafter, while awaiting sentencing for the rape of C.L., he committed the rape of S.M. While in prison, he persistently committed prison rule violations. One of these, possession of a weapon, also drew him an additional three-year sentence. Each time he was released on parole, he violated parole and was returned to prison; one of these parole violations was a new sexual offense. Even without expert testimony, this was substantial evidence of lack of control. Expert testimony, however, was still necessary to establish that defendant's lack of control was due to a diagnosed mental disorder.

---

[1] Available at <http://www.leginfo.ca.gov/pub/95-96/bill/asm/ab_0851-0900/ab_888_bill_950222_introduced.html> (as of Oct. 10, 2002).

[2] Available at <http://www.leginfo.ca.gov/pub/95-96/bill/asm/ab_0851-0900/ab_888_bill_950717_amended_sen.html> (as of Oct. 10, 2002).

[3] Available as <http://www.leginfo.ca.gov/pub/95-96/bill/asm/ab_0851-0900/ab_888_cfa_950915_115934_asm_floor.html> (as of Oct. 10, 2002).

Dr. Kania testified on direct that defendant had both an antisocial personality disorder and a paraphilia involving rape. An antisocial personality disorder causes a pattern of illegal or antisocial behavior, including "sexual misconduct," and this pattern is "entrenched," i.e., highly resistant to change. He added that defendant's particular pattern of forcible rapes was "well[-]entrenched," having begun when he was age 10 or 11 and continued at least until he was 30 or 31. Defendant's history of breaking laws and rules—even when charged with a crime, in prison, or on parole—was also part of this pattern. Finally, Dr. Kania testified that another psychologist had previously diagnosed defendant as having an antisocial personality disorder, noting that he had "impulse problems, difficulty in stopping himself."

According to her testimony on direct, Dr. Miccio-Fonseca likewise diagnosed defendant as having an antisocial personality disorder and a paraphilia involving rape. She testified that defendant "would" engage in sexually violent behavior if released. She also testified that a rapist with defendant's history will reoffend within five years. Her opinion, like Dr. Kania's, was based, in part, on defendant's antisocial personality disorder; his history of sexual offenses, beginning when he was a juvenile; and his probation and parole violations. She believed defendant did not appreciate the seriousness of rape or the impact that rape had had on his victims.

Defendant would argue that this evidence showed only "dangerousness," i.e., a likelihood of reoffending, and therefore it failed to show the independent element of "lack of control." We do not agree, however, that these elements are entirely independent. Admittedly, in *Hendricks*, the Supreme Court stated: "A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment." (*Kansas v. Hendricks, supra,* 521 U.S. at p. 358 [117 S.Ct. at p. 2080].) It added, however: "We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." (*Ibid.*) Thus, either "dangerousness" alone, or a "mental abnormality" alone, is insufficient to prove lack of control. The trier of fact, however, may infer the necessary lack of control from proof of both a "mental abnormality" and "dangerousness," plus proof of a causal link between them.

We conclude that, considering only the evidence the People presented on direct examination, there was sufficient evidence that defendant had a mental illness which made him unlikely to be deterred by the threat of

criminal punishment, and hence likely to reoffend. This amounted to sufficient evidence of lack of control. We therefore need not, and do not, consider defendant's alternative contention that his counsel rendered ineffective assistance by eliciting the only evidence of lack of control.

## III

### "PROSECUTORIAL" MISCONDUCT IN CLOSING ARGUMENT*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV

### DISPOSITION

The judgment is affirmed.

McKinster, Acting P. J., and Gaut, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 15, 2003.

---

*See footnote, *ante*, page 1096.