Filed 8/7/13  P. v. Smeltzer CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MATTHEW SMELTZER,<br><br>    Defendant and Appellant. | D062222<br><br><br><br>(Super. Ct. No. MH101395) |

APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Susan K. Shaler, on appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Bradley Weinreb and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found that Matthew Smeltzer was a sexually violent predator (SVP) for purposes of his continued civil commitment at Coalinga State Hospital (Coalinga). Challenging the judgment on appeal, Smeltzer argues the trial court erred by limiting his presentation of expert testimony on the volitional impairment requirement, and declining to modify an instruction on the volitional impairment requirement. He also asserts his indeterminate commitment violates his constitutional rights. We find no reversible error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Smeltzer's civil commitment arose from his repeated acts of molestation of young children and his diagnosis of pedophilia. In 1985 when Smeltzer was 29 years old, the 10-year-old daughter of his first wife accused him of digitally penetrating her vagina; these allegations were investigated but not pursued by the authorities.[1] In 1991 when Smeltzer was 34 years old, he sustained three convictions of lewd acts against a child under age 14, which formed the predicate offenses for his SVP status.

The 1991 offenses were committed on multiple occasions during a four- to six-week period after Smeltzer distributed a letter at his apartment complex inviting children, ages five to 10, to his apartment for "movie night." While his pregnant wife was at home in another room, Smeltzer molested two seven-year-old girls and a four-year-old girl while they were sitting on his lap covered with a blanket, including touching their genital

---

[1]     Later, after Smeltzer was arrested for child molestation in 1991, he told a mental health evaluator that he was aroused when his stepdaughter would " 'squirm' " over his groin area while sitting on his lap, but he denied that he digitally penetrated her.

areas over or under their underwear. With one of the seven-year-old victims, he also digitally penetrated her vagina and made her touch his penis while she was on his bed. Three other girls at the apartment complex also reported that Smeltzer touched their genital area over their clothing; these charges were not part of his guilty plea but he later admitted to an interviewer that he molested four girls at his apartment. Smeltzer told the probation officer that he would fantasize about these touchings while masturbating. When asked how he felt about molesting the victims when his wife was at home, Smeltzer told the probation officer that he was afraid of being caught, but his desire to molest overcame his fear.

Smeltzer was granted probation for the 1991 offenses, with a suspended 10-year sentence. While released on probation, he at times participated in sex offender treatment. In 1994, he violated probation by being with his children without supervision; this occurred when his wife felt it was safe to leave him alone with their infant twin sons because he had never molested boys and the boys were infants. After this violation, his probation was modified and reinstated. A few months later he violated probation a second time by possessing obscene material about sexual acts with "quasi human/animal figures" that his therapist determined were "pedophilic in nature." Based on this second violation, his probation was revoked and he was sent to prison to serve the 10-year term.

Smeltzer commenced his prison term in 1995, and he was released on parole in 1999. In 2000, he was caught walking out of his residence with a VCR and cartoon videos that would appeal to children, which was in violation of his parole. In this same year, he was found in possession of a list of names of children from Kenya and their ages;

3

he stated he had been corresponding with these children since 1997 through a pastor. He was sent to prison for violating parole and released in December 2000.

In 2002, he wrote letters to three 15-year-old girls using the name and address of a friend (also a convicted sex offender) who lived in the same hotel where he was residing. Also in 2002, he committed a child pornography offense by using a key to go into the friend's room and going online on the friend's computer. He admitted that over a five- to eight-month period he viewed 20 to 100 images of nude children in provocative poses and engaging in sexual acts. He said that "he knows it was not good to do, but he continued." After committing the child pornography offense, in 2003 he was determined to be an SVP and committed to a state hospital.[2] The case before us concerns a 2010 amended petition to commit him as an SVP for an indeterminate term.

At trial, psychologists Robert Owen and Eric Simon testified on behalf of the People.[3] These experts opined that Smeltzer suffers from pedophilia, and his sexual misconduct was predatory in nature because he engaged in a very methodical approach to bring children to him whom he could molest. Further, his condition affected his volitional control and he continued to pose a substantial risk of committing predatory sex offenses if released into the community.

---

[2] Smeltzer pled guilty to the child pornography offense. It appears that he entered his guilty plea and was sentenced for this offense in 2005 (after he was committed to the state hospital in 2003), and he received credit for time served on his prison sentence.

[3] Drs. Owen and Simon reviewed Smeltzer's criminal and medical records but Smeltzer declined to be interviewed by them.

4

In support, the People's experts relied on a variety of factors, including Smeltzer's standardized testing results; his failure to complete an intensive sex offender treatment program; his continued pedophilic behavior notwithstanding criminal punishment; and his distorted cognitive thinking. In standardized testing (the Static-99R), Smeltzer scored in the moderate to high risk range of reoffending based on such factors as reoffending after a penal consequence; actual touching of the victims; unrelated victims; and female victims.[4]

The People's experts testified that Smeltzer could have decreased his risk of reoffending if he had completed the "phase treatment program" at Coalinga, which is a comprehensive, intensive sex offender treatment program that specifically addresses sexual deviance and takes years to complete. Smeltzer attended an introduction to the program, but then declined to participate in it. He was not a behavior problem at Coalinga and he participated in groups and classes, including a sexual compulsivity recovery group. These courses are considered "peripheral" to treatment and although they can address some of the sex offender issues, they are not "anywhere near the level of

---

[4]     Factors that reduced Smeltzer's risk level under the Static-99R included his older age, past long-term relationship with a partner, lack of violence, and lack of general criminality. Smeltzer's moderate to high risk category meant there is a 20 percent likelihood of reoffending over five years and a 30 percent likelihood of reoffending over 10 years.

intensity and thoroughness" of the phase program.[5]

Smeltzer's volitional impairment was shown by his pattern of continued pedophilic behavior when released into the community, which indicated he was unlikely to be deterred by the threat of future criminal punishment. He had police contact due to the 1985 accusation by his stepdaughter, and yet in 1991 he engaged in "considerable pedophilic behavior" (the lewd act convictions). He was placed on probation, but he continued to engage in pedophilic behavior (possessing the pedophilic-in-nature material in 1994) that resulted in a 10-year prison sentence. Upon his release from prison, in 2000 he engaged in "potential pedophilic behavior" (possessing the children's cartoon videos) which resulted in a parole violation and return to prison. Undeterred, in 2002 he again violated parole by possessing child pornography, which led to another conviction and prison sentence.

Smeltzer exhibited cognitive distortions common in individuals with pedophilia that can promote sexual reoffending. In 1991, he said he believed the girls liked the touching because they did not protest; the manner in which he touched the girls was " 'not

---

[5]     At Coalinga, Smeltzer participated in such courses as sexual compulsivity recovery; discharge planning; pet therapy; managing anxiety, and relationships.

In contrast, the sex offender treatment program is a five-phased program, consisting of: (1) an introduction; (2) intensive treatment involving examining the offenses and precipitating factors, writing an autobiography and timeline of sexual experience and victims, and taking a lie detector test and arousal test; (3) enacting what has been learned and keeping a journal of sexual urges; (4) treatment readiness involving preparing to return to the community and developing plans not to reoffend; and (5) ongoing treatment in the community.

that bad' " compared to other sexual offenders; and he engaged in the touching because of such factors as his unhappy, sexless marriage, depression, anxiety, and loneliness.  He also sanitized his history of sexual deviance by saying he had actually touched only one victim and he did not realize he was pleading guilty to touching three victims.  After the 2002 child pornography offense, he continued to manifest cognitive distortions, for example, blaming the offense on his friend who owned the computer, and saying the offense was not " 'that bad' "; some of the images just "popped up" on the screen; he was " 'only curious' "; and it was " 'not like [he was] out walking around schools or following kids around.' "  Dr. Owen testified that he did not see anything in Smeltzer's records indicating he had addressed his cognitive distortions at Coalinga.

The People's experts also rejected the notion that Smeltzer's risk of reoffending was reduced because he had a low sex drive as shown by a history of sparse sexual activity.[6]  The experts testified that Smeltzer's low sex drive claim was contradicted by his 1994 probation violation showing a preoccupation with sexual material and his 2002 child pornography offense.

The People's experts concluded Smeltzer continued to meet the SVP criteria because his condition impaired his self-control and it was likely he would sexually reoffend with children if released.

---

[6]    Smeltzer had reported to various interviewers that he was molested at age 8; he first had sexual intercourse at age 19 or 20; and he rarely had intercourse with his first wife.

*Defense*

To refute the People's claim that he still qualified as an SVP, Smeltzer presented testimony from numerous Coalinga personnel, including two psychologists, two social workers, a rehabilitation therapist, and four psychiatric technicians. He also presented testimony from a psychiatrist who was retained by the defense to evaluate him.

Defense witnesses testified that Smeltzer was not a "fixated" pedophile, but rather was a "situational" child sexual offender who engaged in the 1991 molestation due to environmental stressors. His sexual history showed he had a low sex drive, and he did not suffer from volitional impairment but was "overly inhibited." Although the phase program was designed to be the core sex offender treatment program at Coalinga, it was not the only means of treatment. Other programs, including the sexual compulsivity recovery group, could complement the phase program or serve as an alternative program. Smeltzer had participated in the sexual compulsivity recovery group and other therapeutic courses, and he had learned about such concepts as trauma as a cause of sexual addiction, triggers for sexual behavior, empathy for victims, skills to manage deviant thoughts, and establishing a support system in the community. He had also addressed his depression and anxiety which can trigger sexual deviancy. He had no difficulty controlling himself in the stressful hospital environment, and he had not possessed pornography even though it is illegally available at the hospital.

The defense witnesses opined that if he was released into the community, Smeltzer would voluntarily seek treatment, and he had a very low risk of reoffending because the

8

molestation occurred in isolated circumstances that were unlikely to be repeated; he was not a fixated pedophile; and he was no longer anxious and depressed.

*Jury Verdict*

The jury found that Smeltzer was an SVP, and the court committed him to an indeterminate term with the California Department of Mental Health. (Welf. & Inst. Code, § 6600 et seq.)

DISCUSSION

I. *Claims of Error Related to the Volitional Impairment Standard*

Smeltzer argues the trial court violated his due process rights by (1) precluding his expert witness from testifying regarding the legal standards applicable to volitional impairment, and (2) refusing his request to modify the language in the standard jury instruction to state that volitional control must be *seriously* affected.

As a matter of federal constitutional due process, a person may not be subjected to involuntary civil commitment unless the person, as a result of a mental abnormality, has serious difficulty controlling his or her dangerous behavior. (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 40-41; *People v. Williams* (2003) 31 Cal.4th 757, 759, 766.) This control impairment requirement for civil commitment distinguishes those offenders whose mental disorders impair their volitional control over their dangerousness from other dangerous offenders who are more properly dealt with exclusively through criminal proceedings. (*People v. Williams, supra*, at pp. 766-767.) The volitional impairment need not involve total or complete lack of control; however, there must be a serious

difficulty in controlling behavior. (*In re Lemanuel C., supra*, at p. 42; *People v. Williams, supra*, 31 Cal.4th at p. 773.)

With these general principles in mind, we evaluate Smeltzer's claims of error concerning the volitional impairment requirement.

A. *Background*

The expert witnesses called by the People and the defense were questioned at length, both on direct and cross-examination, about whether Smeltzer's mental disorder affected his ability to control his urges to molest children. The People's witness Dr. Owen testified that Smeltzer's pedophilia affected his "self-control, volitional control," as shown by the fact that he has not been deterred by consequences but "just keeps going in a deviant direction[,]" and the fact that he has been sanctioned and ignores the possible consequences shows he is "driven by some underlying, unhealthy urges . . . ." Similarly, the People's witness Dr. Simon testified that there was a "driven quality" to Smeltzer's actions; his pattern of continued pedophilic activity notwithstanding repeated detection and punishment shows he has "a certain amount of volitional impairment"; and his complete lack of criminal behavior apart from pedophilic conduct shows that his trouble "lies in controlling his [pedophilic] impulses."

Both of the People's experts referred to an appellate court decision (*People v. Burris* (2002) 102 Cal.App.4th 1096) as providing a useful definition of volitional impairment. Dr. Owen testified the *Burris* decision "says that if a man has not been deterred by a prior consequence such as going to prison, this is an example of volitional impairment." Dr. Simon testified the *Burris* decision states "someone who evidences a

10

pattern of detection followed by punishment followed by new sex offenses, . . . that the person's not likely to be deterred by the threat of future criminal punishment and that that would indicate volitional impairment."

During this line of questioning, defense counsel sought to elicit testimony from the People's experts that the SVP finding required a showing of *serious* impairment and that mere recidivism did not necessarily establish this requirement. At one point Dr. Owen testified there is a continuum of volitional impairment from "mild, moderate to severe," but in this case there was "ample evidence of a man here who just hasn't been deterred by consequences and he just keeps going in a deviant direction." When queried specifically on the issue of whether the volitional impairment needed to be serious, Dr. Owen initially agreed the law requires serious volitional impairment. However, after the prosecutor objected that the term "serious" was a misstatement of the law, Dr. Owen testified he did not recall seeing the word "serious" in the case law, and he "misspoke" if he earlier acknowledged seriousness as a requirement.

Dr. Simon testified on cross-examination that there had "to be some but not necessarily complete" volitional impairment to qualify as an SVP. He agreed that sex offenders who have a "serious difficulty controlling" their deviant impulses posed a greater risk than people who have a "degree of control"; in general the SVP law was "looking for those higher risk offenders" who have "a diminished ability to control themselves"; and persons who meet the SVP criteria have "a serious deficiency in their ability to control themselves." Also, Dr. Simon generally agreed recidivism "is not enough by itself to show someone can't control their behavior" and it was necessary "to

11

look at a lifetime of experience to see if that person has had a history of having difficulty controlling their behavior . . . ."

At several points while pursuing the control impairment issue, defense counsel asked the People's experts about the case law, including the *Burris* case. In response, the court admonished counsel not to get into a discussion of the witness's interpretation of the case law; however, the witness could state what standards he used to form his opinion, and the jury could determine whether the standards used by the witness comported with the court's instructions on the law. Based on this ruling, the court told defense counsel not "to go any further into discussion of specific cases" while questioning Dr. Owen about the seriousness requirement, and the court sustained an objection to defense counsel's questioning of Dr. Simon about the factual details of the *Burris* case.

During the defense case, the defense expert witness (psychiatrist Alan Abrams) testified that SVP case law requires that the person have serious difficulty controlling his or her sexual violence. When defense counsel sought to elicit testimony from Dr. Abrams about the *Burris* case, the trial court reiterated that the expert witness could state the definition he used and the jury could compare it with the definition given by the court, but the questioning could not involve "a legal discussion."

After an unreported sidebar discussion, defense counsel was permitted to ask additional questions about Dr. Abrams's understanding of the volitional impairment requirement. Dr. Abrams testified that reoffending after punishment was "one factor to look at"; this factor was "the minimum criteria" for volitional impairment; the question was whether the person was starting "a pattern of inability to control behavior"; and not

12

all pedophiles suffer from inability to control themselves. Further, Dr. Abrams agreed that to understand the volitional impairment requirement, typically it was not sufficient to "just read one line from one case like *Burris*"; rather, it is usually necessary to read many more cases.

After this testimony was presented to the jury, defense counsel argued to the trial court that People's expert Dr. Owens had given the jury a "false impression" regarding the definition of volitional impairment set forth in the *Burris* case which he used in formulating his opinion, and accordingly the trial court had improperly precluded defense counsel from asking Dr. Abrams (who had a law degree) about his interpretation of the *Burris* case. Defense counsel asserted that although he could argue the People's expert had used a flawed definition of volitional impairment, it would be "a meaningless argument" if there was no foundational support for the argument that the expert did not properly understand the case. The prosecutor argued the court had not erred because defense counsel was allowed to ask Dr. Abrams about his interpretation of the law that he used to form his opinions, and the court had merely excluded a lengthy recitation and interpretation of each case.

The trial court ruled that additional questioning of Dr. Abrams on this point had minimal relevance, and the relevance was substantially outweighed by the likelihood of confusion under Evidence Code section 352. The court reasoned the important issue was whether the expert used the proper standard on the lack of control requirement; the parties could argue to the jury if an expert did not use the proper standard; and testimony

13

by the experts explaining the case law would usurp the court's function and be irrelevant and confusing.

## B. *Analysis*

### 1. *Limitation on Defense Expert's Testimony*

Smeltzer argues the People's expert witnesses misstated the volitional impairment requirement by reducing it "to simply nothing more than a history of offending more than once," rather than the correct definition that the person must have a serious difficulty controlling his or her behavior. He asserts the trial court's limitation on the defense expert's testimony, including regarding the *Burris* decision cited by the People's experts, precluded him from confronting the People's experts about their misstatements.

Contrary to Smeltzer's contention, he was not precluded from challenging the People's experts' reliance on recidivism as a factor showing control impairment. Defense counsel elicited testimony from the defense expert that the correct standard was whether the person had serious difficulty controlling sexual misbehavior, and recidivism was simply one relevant factor to consider. Smeltzer has not explained how testimony from the defense expert on the specifics of the *Burris* decision would have meaningfully augmented the defense expert's testimony on this point.

The record shows Smeltzer had a full opportunity to present testimony from his expert witness on the definition of volitional impairment, and his due process rights were not impeded by the trial court's ruling precluding both the People's and the defense experts from expounding on the case law underlying the volitional impairment definition.

## 2. *Instruction on Volitional Impairment*

With respect to the volitional impairment requirement, the jury was instructed in relevant part as follows:

> "To prove [the SVP] allegation, the People must prove beyond a reasonable doubt that . . . [¶] . . . [¶] [*a*]s *a result of that diagnosed mental disorder, [Smeltzer] is a danger to the health and safety of others because it is likely he will engage* in sexually violent predatory criminal behavior;
>
> "And . . . , it is necessary to keep him in custody in a secured facility to ensure the health and safety of others. [¶] The term diagnosed mental disorder includes conditions . . . *that affect a person's ability to control emotions and behavior that predispose the person to commit criminal sexual acts to an extent that makes him a menace to the health and safety of others*.
>
> "*A person is likely to engage in sexually violent predatory criminal behavior if there is a substantial, serious and well-founded risk that the person will engage in such conduct if released in the community.* The likelihood that the person will engage in such conduct does not have to be greater than 50 percent." (Italics added and omitted; see CALCRIM No. 3454.)

During discussions with the trial court, Smeltzer's counsel requested that instead of merely instructing the jury that the person's mental disorder must *affect* a person's ability to control behavior, the jury should be told the disorder must *seriously affect* the person's ability to control behavior. Defense counsel argued that without explicit language requiring the jury to find a serious impairment, the jury might be confused because one of the People's experts had misstated the standard and the standard had not been corrected in any other fashion. The court rejected defense counsel's request, finding the use of the term "serious" was not necessary because the instruction clearly defined the level of impairment that must be shown.

15

On appeal, Smeltzer asserts it was essential to include the term "serious" because the People's experts misstated the volitional impairment standard, and the instruction did not contain any specific language informing the jury the control impairment must be serious. He also asserts the evidence in his case warranted a pinpoint instruction on the serious control impairment requirement based on the evidence that he did not lose control in the stressful hospital environment; he had gained insight and tools for maintaining control; and he had a low sex drive.

In *People v. Williams*, the California Supreme Court held the serious control impairment requirement is necessarily conveyed to the jury based on an instruction following the SVP statutory language (i.e., a disorder affecting volitional capacity that predisposes the person to commit sex crimes in a menacing degree and produces a substantial, serious and well-founded risk of reoffense), and no additional instruction is required. (*People v. Williams, supra*, 31 Cal.4th at pp. 759, 776-777.) *Williams* also underscored that, under United States Supreme Court authority, the lack of control element does not have a narrow or technical meaning amenable to an exact standard and enforceable through rigid bright-line rules; rather, the standard can properly be articulated by state legislatures as long it does not dispense with the requirement that there be proof of serious difficulty in controlling behavior. (*Id.* at pp. 772-774.)

Here, the record shows that at one point the jury was presented with information that called into question the seriousness requirement. That is, during cross-examination of People's expert Dr. Owen, defense counsel asked whether the volitional impairment needed to be serious, and the prosecutor objected that the term "serious" was a

16

misstatement of the law. Dr. Owen then testified he did not recall seeing the term "serious" in the case law, and he misspoke if he had earlier agreed that seriousness was a requirement under the case law.

In appropriate circumstances a defendant is entitled upon request to an instruction that clarifies the law. (See *People v. Butler* (2010) 187 Cal.App.4th 998, 1013.) Assuming arguendo the court erred by declining to add the word "serious" to the instruction, any error was harmless beyond a reasonable doubt. (*People v. Williams, supra*, 31 Cal.4th at p. 778.) Viewing the record as a whole, we have no doubt the jury understood the control impairment must be serious. The SVP instructions told the jury that (1) the disorder must make it *likely* the person will engage in sexually violent predatory behavior; (2) the disorder includes conditions affecting ability to control that create a predisposition to commit sexual acts *to such an extent* that the person is a *menace* to safety; and (3) there is a likelihood of sexually violent predatory behavior if there is a *substantial, serious, and well-founded risk* of such conduct. An instruction requiring that the person must constitute a menace to society and pose a substantial and serious risk of misconduct undoubtedly conveyed to the jury that the control impairment must be serious. (*People v. Williams, supra*, 31 Cal. 4th at pp. 774-777; *In re Lemanuel C., supra*, 41 Cal.4th at p. 42.)

Further, the serious control impairment requirement was conceded during the testimony of People's expert Dr. Simon, who acknowledged that persons who meet the SVP criteria have a "serious deficiency" in their ability to control themselves. In closing arguments, although counsel for both parties sought to define the term "serious" in the

manner most favorable to their positions, there was no claim that seriousness was not a requirement.  The prosecutor argued that Smeltzer's control was impaired to such a degree that he acted even though he knew he might suffer criminal consequences: "Volitional capacity, he was able to override his fears that told him 'Don't do this behavior. . . .  You're going to get caught.'  He did it anyways.  So that shows the volitional capacity that's impaired, that it's affected."  Defense counsel emphasized that an SVP finding requires a "serious impairment" of ability to control to "such an intensity of urge and effect on the person that they lose control of their volition[,]"; an "inability to control" such that the person poses a "serious, substantial and well-founded risk . . . ."; "[w]e're looking for those people that can't control themselves . . . ."  In rebuttal the prosecutor argued that Smeltzer's pedophilia affected his ability to control, he could not control his behavior, and he posed a serious, nontrivial risk of reoffending:  "Does he have a disorder that affects his ability to control his behavior?  Yes.  Is he likely to reoffend again?  Yes. . . . [¶] . . . [¶]  And what's the other bit of evidence that we have that shows that *he cannot control* his behavior?  We have the investigation in '85, arrest in '91, crime-arrest, crime-arrest, crime-arrest cycle. . . .  [¶] . . . [¶] . . . [*I*]*s the risk presented serious*?  Yes?  What's the antonym?  Trivial or meaningless.  Are we talking meaningless risk here?  No.  Even his own experts say he presents a risk.  [¶] . . . [¶] [A]ll the instruments . . . [place] him in either the moderate-high or the high-risk component." (Italics added.)

The record as a whole shows the jurors were presented with testimony, instructions, and closing argument that repeatedly informed them that the control

impairment must be serious. There is no reasonable possibility the jury thought Smeltzer could qualify as an SVP if he did not have serious difficulty controlling his pedophilia. Accordingly, any error in failing to clarify the seriousness requirement in the jury instructions was harmless.

## II. *Constitutional Challenges*

Smeltzer raises several constitutional challenges to his indeterminate commitment that have been repeatedly rejected by the courts, including denial of equal protection, denial of due process, ex post facto violation, cruel and unusual punishment, and double jeopardy. (*People v. McKee* (2010) 47 Cal.4th 1172, 1193, 1195 (*McKee I*) [rejecting due process and ex post facto challenges]; *People v. McKee* (2012) 207 Cal.App.4th 1325, 1347-1348 (*McKee II*) [rejecting equal protection challenge]; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1383 [rejecting cruel and unusual punishment and double jeopardy challenges]; accord *People v. Landau* (2013) 214 Cal.App.4th 1, 8, 44-45; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1085-1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864.) We agree with this case authority, and it is not necessary for us to repeat the extensive analyses set forth in these decisions that respond to Smeltzer's challenges. Based on this precedent, we reject Smeltzer's various constitutional challenges.

With respect to his equal protection challenge, Smeltzer argues he is entitled to an individual assessment as to whether he should be subjected to an indeterminate term when other civilly committed offenders are not, and the case should be remanded to the trial court to make these findings in his specific case. Because Smeltzer did not raise this

19

fact-based claim before the trial court, we deem it forfeited on appeal. (See *In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.)

In any event, we also reject it on the merits. In *McKee I*, the California Supreme Court stated that on remand the People would have an opportunity to prove that SVP's "as a class" pose a greater risk than similarly-situated offenders so as to justify indefinite commitment "at least as applied to McKee." (*McKee I, supra*, 47 Cal.4th at pp. 1208, 1210.) At the remand hearing, after an extensive evidentiary presentation, the trial court found the People had made the requisite showing, and on appeal our court affirmed the trial court's ruling. (*McKee II, supra*, 207 Cal.App.4th at pp. 1330-1331, 1348.) In our decision on appeal, we concluded that the information presented by the People supported that SVP's as a class pose distinct dangers that permit them to be treated differently from other types of offenders, and our holding was not premised on McKee's particular characteristics. (*Id*. at pp. 1340-1348.) Given the scope of our holding, we reject Smeltzer's contention that he is entitled to an individualized determination of his equal protection challenge. (Accord, *People v. McKnight, supra*, 212 Cal.App.4th at pp. 863-864 [*McKee II*'s equal protection holding applies to "class of SVP's as a whole," not to Mr. McKee alone]; *People v. McDonald, supra*, 214 Cal.App.4th at pp. 1377-1378.)

DISPOSITION

The judgment is affirmed.


                                                                        HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McINTYRE, J.

21