Filed 10/26/15  P. v. Nelson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>STEVE CLEMENT NELSON,<br><br>        Defendant and Appellant. | A138885<br><br>(Sonoma County<br>Super. Ct. No. SCR34147) |

Steve Clement Nelson appeals from an order of commitment upon a jury verdict finding him to be a sexually violent predator (SVP) under the Sexually Violent Predators Act (SVPA), Welfare and Institutions Code[1] section 6600 et seq.  The trial court committed defendant to the Coalinga State Hospital for an indeterminate term. Defendant contends that his SVP commitment must be reversed because he was unlawfully in custody due to the negligence or bad faith on the part of the court and the California Department of Corrections and Rehabilitation (CDCR).  He also argues that: (1) his indefinite commitment violates his due process rights because his diagnoses are insufficient to support an SVP commitment; (2) the court erred in instructing the jury pursuant to CALCRIM No. 3454 on the People's burden of proof and in refusing to instruct on circumstantial evidence; and (3) the SVPA violates the equal protection, ex post facto, double jeopardy, and cruel and unusual punishment clauses of the state and

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

1

federal constitutions because SVP's are not treated until the expiration of their prison terms. We affirm.

## I. FACTUAL BACKGROUND

The following evidence was adduced at trial: Dr. Nancy Webber, a psychologist, testified that she conducted an SVP evaluation of defendant. She reviewed defendant's criminal sexual history, which began on March 3, 1977. Defendant was then 26 years old; Janis, the victim, was 52 years old. Defendant went to Janis's house and when she responded to the door, he asked if her daughter was there. Janis knew defendant because her daughter had dated him several days earlier. Defendant told Janis that his mother was ill and that he needed a ride to her house.

At approximately 1:15 a.m., Janis drove defendant in her car and followed his directions. He directed her to a remote area where he pulled out a knife and sexually assaulted her. He digitally penetrated her and forced her to orally copulate him. He then directed her to drive him to his trailer where he shaved her pubic area. He again forced her to orally copulate him and placed his fingers in her vagina.

Janis then told defendant that she was worried about her son, who was home alone and would soon be waking up to go to school. Defendant initially lied and told her an accomplice had picked up her son. He subsequently admitted that he had lied and allowed her to return home. She reported the incident to the police. Defendant was convicted of kidnapping and perversion while armed and sentenced to prison.

Defendant served about two years in prison and was released on December 31, 1979. Approximately five months later, defendant reoffended. He convinced an 18-year-old woman whom he met at a party to go out to his van. There, he brandished a knife, bound and gagged her, digitally penetrated her, and forced her to orally copulate him. The woman managed to escape.

That same evening, defendant drove several blocks away to the home of Aida, a 65-year-old woman. Aida had been a neighbor to defendant and his parents when he was growing up and took care of him when his parents fought. Aida was at home with her

2

28-year-old daughter. Defendant asked the daughter to be the maid of honor at his wedding and made some phone calls.

At some point, defendant got Aida to the bathroom with him to check on what he reported was a leak in the faucet. There, defendant threatened her with a knife and demanded money and a car, which Aida refused. Defendant then separated Aida from her daughter and tied them up in separate rooms.

Defendant shaved Aida's pubic hair and kissed her breasts. Meanwhile, Aida's daughter was yelling, so defendant returned to her and taped over her eyes. During these incidents, another member of the household returned home and called the police.

Defendant was charged with the sex offenses involving the 18-year-old woman and false imprisonment and assault against the other two women. He was convicted of oral copulation by force, found to be a mentally disordered sex offender, and was placed in the Atascadero State Hospital. He was released from Atascadero in 1985.

While still on parole, defendant committed another sexual offense on February 15, 1998. He knew the victim through his job as a chemical dependency counselor. He went to her home one evening and told her that he had been in a motorcycle accident. She let him into her home and he took out a knife and ordered her to take off her clothes. When she refused, he removed her blouse and ordered her to lie face down on the bed and put her hands behind her back. She resisted and managed to flee from her home, screaming for help. A neighbor heard her and called the police. Defendant was convicted of attempted rape by force and sentenced to 10 years in prison.

Defendant was released on May 14, 1993, and committed another offense approximately seven months later in December 1993. He was acquainted with the victim through a recovering addicts group. He appeared at the victim's house at about 11:30 p.m. in the evening and told her that he had car trouble. He asked to use her telephone. She let him in her home and while he was supposedly waiting for assistance with his car, she fell asleep. She awoke to find defendant threatening her with a knife. Defendant tied her up and forced her to orally copulate him. He also attempted to rape her but was unable to achieve penetration. When defendant finally released her after

3

several hours, he begged her not to report him. Because defendant was on parole, the offenses were charged as parole violations and defendant was returned to prison.

Defendant was in prison for about two years and released on parole, but subsequently committed a number of parole violations and was in and out of prison until June 1997.

After being paroled in 1997, defendant again reoffended. The offense occurred on April 22, 2004; defendant was then 53 years old. The victim was a 70-year-old woman who lived across the street from defendant's girlfriend's home. Defendant had separated from his girlfriend but was housesitting for her. He went to the victim's house and smoked cigarettes with her. At some point, he talked about bedroom furniture and asked to see hers. She refused to go to the bedroom with him and became nervous. Defendant went to her bathroom and told her that water was leaking onto the floor. The victim became suspicious and tried to get defendant to leave her home. At one point, defendant got a large kitchen knife, held it to her neck, and told her to lie down on the floor. He also demanded her car keys. She refused and told him to get out of her house or she was going to kill him. Defendant left. As a result of the incident, defendant was convicted of attempted robbery and sentenced to five years in prison.

Webber also testified about defendant's developmental history, which she considered in her evaluation of whether defendant is a mentally disordered sex offender. She testified that defendant, an only child, grew up in a dysfunctional family. His parents were severe alcoholics and there was domestic violence in the household. Between the ages of 13 and 24, defendant had a sexual relationship with his mother. He initially just fondled her, but eventually, when she was passed out drunk, he tried to have sexual intercourse with her. She initially protested but then allowed him to have intercourse with her. His mother continued to allow him to have sex with her if he bought liquor for her. Even after defendant had girlfriends and was married, he had sex with his mother until he was about 24 years old. The sexual activity stopped when his mother became sober.

4

Defendant also reported that he masturbated to nude photographs of his mother and that he became sexually aroused when she showed him that his father had shaved her pubic area. He told the staff at Atascadero that he found older women attractive and was often attracted to women who looked like his mother.

Defendant was committed to the Coalinga State Hospital in April 2011. While he has engaged in self-help and coping related groups, he has not participated in the sex offender treatment program. He told Webber that he did not need sex offender treatment but would participate in treatment on an outpatient basis.

Webber diagnosed defendant with paraphilia not otherwise specified (NOS) with a focus of sexual arousal with non-consenting females, sexual sadism, methamphetamine and alcohol dependence in a controlled environment, and antisocial personality disorder (ASPD). Webber opined that the paraphilia diagnosis was still current despite the last offense having occurred in 2004 because it is a chronic condition. Based on the diagnoses, she concluded that defendant was predisposed to commit criminal sexual acts and that defendant's ASPD and alcohol and methamphetamine dependence exacerbated and worsened the severity of his conditions. She testified that defendant's institutional behavior was not a good predictor of his risk of reoffending, as defendant had repeatedly reoffended upon release. She opined that defendant was at risk of reoffending and that he met the criteria for an SVP.

Dr. Roger Karlsson, a psychologist, also testified that defendant met the criteria of an SVP. He opined that defendant, despite his age, was still at risk of reoffending, particularly due to his preference for older women. Based on testing using several actuarial measures, Karlsson quantified defendant's risk of reoffending as being moderately high. Karlsson diagnosed defendant with paraphilia NOS nonconsensual and sexual sadism. He opined that the diagnosis was current and that it was a chronic condition. The fact that defendant was institutionalized was not significant in determining his risk of reoffending as he was under surveillance. He also diagnosed defendant as having polysubstance dependence, with physiological dependence in a controlled environment, and ASPD.

The People called defendant as a witness. He did not deny the sex offenses of which he was convicted, but testified that he did not have a mental disorder. Due to the passage of time, however, defendant could not recall each of the sex offenses he committed and claimed that he was under the influence of methamphetamine. He attributed some of the offenses to his drug use and his incestuous relationship with his mother. At the time of trial in May 2013, defendant was almost 63 years old. He testified that he no longer had as strong a sex drive as when he was younger and was not preoccupied with sex. Defendant also testified about several health issues. He had neck surgery in 2008 and experiences numbness in his hands and legs. He uses a walker. He also had a back operation in 2012 to correct stenosis in the lower back, which helped with some of his pain issues.

Dr. Brian Abbott, a psychologist, testified on behalf of defendant. He opined that there was no scientific evidence that a diagnosis of paraphilia NOS nonconsensual was chronic or long-lasting. He also opined that without recent objective indications of the symptoms of paraphilia, such as words or behavior reflecting difficulty controlling sexually violent behavior, a diagnosed individual is no longer suffering from the condition. Finally, he concluded that the People's psychologists had not adequately accounted for the mitigating effects of defendant's advancing age.

Dr. Mary Jane Adams, a clinical psychologist, also testified on behalf of defendant. She disagreed with the diagnoses of the People's psychologists. She testified that it could not be inferred that a person had deviant sexual arousal simply from the number of offenses committed. Adams opined that defendant's offenses appeared opportunistic and impulsive rather than paraphilic and that the assaults resulted from his abuse of methamphetamine. She diagnosed defendant with ASPD, the symptoms of which she opined would decrease with age. She also testified that there was no evidence that defendant was currently showing symptoms of antisocial behavior. Defendant, however, did have several mental disorders, a pattern of low level depression, methamphetamine dependence, and alcohol abuse which were in institutional remission.

6

Adams concluded that defendant did not pose a risk of reoffending primarily due to his age, physical health, and limited mobility.

## II.  DISCUSSION

### A.  *Lawful custody*

Defendant contends that the order committing him as an SVP must be reversed because he was not in lawful custody at the time the People filed their SVP commitment petition due to the negligence or bad faith of the trial court and the CDCR.

#### 1. Background:

On October 28, 2004, defendant pled guilty to the April 2004 attempted first degree robbery with the use of a knife.  He also admitted having suffered two prior strike convictions.  On December 6, 2004, the court dismissed one of the strike convictions, sentenced defendant to three years on the attempted robbery, and doubled the one-year enhancement for use of the knife to two years for a total term of five years in state prison. The court erred in the sentencing as it incorrectly calculated the term for the attempted robbery offense and doubled an enhancement, which is not permitted by the Three Strikes law.  (See § 213(a)(1)(B); *People v. Martin* (1995) 32 Cal.App.4th 656, 666, overruled on other grounds in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10 [law does not permit doubling of an enhancement].)

Defendant did not appeal the sentence, but the CDCR discovered the error in May 2008, and requested that the court modify the abstract of judgment.  The CDCR, however, incorrectly advised the court that defendant was convicted of attempted second degree robbery.

On May 28, 2008, the court filed an amended abstract of judgment, imposing a term of four years for the robbery and a one-year term for the enhancement.  The amended abstract incorrectly listed the crime as a second degree robbery (Pen. Code, § 212.5, subd. (c)) rather than an attempted first degree robbery (Pen. Code, §§ 664/212.5, subd. (a)).  On June 2, 2008, the court again amended the abstract of judgment and imposed a five-year upper term for second degree robbery and stayed the sentence on the enhancement.

7

The People filed the present petition to commit defendant as an SVP on June 26, 2008. The petition alleged that defendant was then an inmate at the CDCR and that he had three qualifying sexually violent offenses: (1) an August 12, 1977 oral copulation (Pen. Code, § 288a) conviction; (2) an October 9, 1980 oral copulation conviction; and (3) a July 14, 1998 attempted rape conviction (Pen. Code, §§ 664/261, subd. (a)(2)).

Defendant moved to dismiss the petition, contending that due to the trial court's sentencing errors, he was unlawfully in custody at the time that the CDCR referred him for an SVP evaluation.[2] He argued that the trial court should have imposed the mitigated term of three years for the first degree attempted robbery conviction with an additional year for the enhancement for a total term of four years in state prison. Thus, he claimed that as a result of the trial court's sentencing errors, his sentence was unlawfully prolonged by at least one year.

The People opposed the petition, arguing that defendant's earliest release date was initially August 8, 2007, but that it was extended to July 12, 2008, and later to October 2, 2008, based in part on defendant's behavior in prison. While the People conceded that the extension to October 2008 was "likely the result of the erroneous amendment of petitioner's conviction," they asserted that there was nothing in the record indicating that the initial extension of the sentence to July 12, 2008 was based on any error committed by the court or a mistake by CDCR.

The trial court denied the petition, finding that the trial court's sentencing error was not negligent or intentional wrongdoing, and that the CDCR's reliance on the release date of October 2, 2008 was in good faith. The court cited section 6601, subdivision (a)(2), which provides that "[a] petition [for commitment of a sexually violent predator] shall not be dismissed on the basis of a later judicial or administrative determination that the individual's custody was unlawful, if the unlawful custody was the result of a good faith mistake of fact or law." We review the trial court's determination

---

[2] The CDCR referred defendant for an SVP evaluation pursuant to section 6601, subdivision (a) on December 18, 2007.

of good faith under the substantial evidence standard of review. (*Langhorne v. Superior Court* (2009) 179 Cal.App.4th 225, 238.)

### 2. Analysis

The court's sentencing error was not made in bad faith. Defendant did not object to the sentence at the sentencing hearing and did not appeal it. The record of the sentencing hearing reflects that the court spent considerable time considering defendant's *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530 motion[3] and expressed some uncertainty about whether to double the sentence on the enhancement. Neither defendant's counsel nor the deputy district attorney enlightened the court on this issue. And, the CDCR did not discover the sentencing error until May 2008, when it informed the court.[4] The court immediately attempted to correct the error upon receipt of the CDCR's letter informing it of the error.

While the trial court found that defendant should have been released on September 17, 2007, and thus the People's June 2008 petition was untimely, in accordance with section 6601, subdivision (a)(2), the People's petition was lawfully filed because the court's subsequent determination that defendant should have been released sooner was the result of a good faith mistake of fact or law.[5]

Relying on *People v. Superior Court (Small)* (2008) 159 Cal.App.4th 301, defendant argues that his unlawful custody was the result of the court's or CDCR's negligence or bad faith. In *Small*, the petitioner was scheduled to be released from prison

---

[3] The court granted defendant's motion to strike his 1973 prior strike conviction.

[4] A copy of the letter was sent to defendant, the district attorney, and the public defender, but none of these parties received the letter.

[5] Defendant argues that his release date should have been August 10, 2007 because the trial court should have applied a 20 percent credit limitation rather than a 15 percent credit limitation due to the prior strike. The Attorney General concedes that defendant was subject to the 20 percent credit limitation of Penal Code section 667, subdivision (c)(5) because defendant's offense of attempted robbery is a serious felony under Penal Code section 1192.7, subdivision (c)(39), not a violent felony. In any event, the fact that the People's petition was filed after the date defendant should have been released was not due to the trial court's or the CDCR's negligence or bad faith.

but the CDCR kept the defendant in prison an extra day in order to allow the People to file a petition to commit him as an SVP. (*Id.* at p. 304.) The court of appeal upheld the trial court's dismissal of the petition, concluding that the petitioner was unlawfully in custody because the People failed to show that the delay in filing the petition resulted from a good faith mistake of fact or law. (*Ibid.*) Rather, the court determined that delay in filing the petition was due to the Department of Mental Health's (DMH) increased workload of SVP evaluations following the passage of Jessica's Law (§ 6604), which was not from a legal or factual mistake but instead was something that the CDCR and DMH could have anticipated. (*Id.* at pp. 305, 310.)

Here, defendant remained in custody due to the trial court's legal mistake in sentencing defendant; the court was mistaken on the application of the Three Strikes law to enhancements. There is nothing in the record to demonstrate that the court's error was in bad faith or the result of negligence. At the time, defendant faced a sentence of 25 years to life, yet with the court's dismissal of one of his strike priors, the court sentenced defendant to a term of just five years. It is thus understandable that defense counsel did not object or appeal the sentence, and hence the court's error did not come to light until the CDCR discovered it in 2008. While, in hindsight, the sentencing court's error might have easily been determined, there is no showing that the court's action was the result of intentional wrongdoing or negligence.[6] Substantial evidence supports the

---

[6] Defendant points out that the sentencing court should have known that under the Three Strikes law, Penal Code section 667, subdivision (e)(1) provides for the doubling of the base term, which does not include enhancements for prior convictions (see *People v. Ramirez* (1995) 33 Cal.App.4th 559, 574 [under Penal Code section 667, subdivision (e)(1), the phrase, "term otherwise provided as punishment for the current felony conviction" does not include enhancements for prior convictions]; *People v. Martin*, *supra*, 32 Cal.App.4th at p. 666 [law does not allow doubling of an enhancement].). While we agree that the court should have been aware of the law, we are also cognizant that the Three Strikes law resulted in numerous sentencing errors long after its enactment. In this case, the court also appears to have been confused about the sentencing triad for attempted first degree robbery. (Compare Pen. Code, § 664, subd. (a) [attempts punishable by imprisonment for one-half the term prescribed for conviction of the offense attempted] with Pen. Code, § 18 [felony punishable by imprisonment for 16 months, two,

10

court's finding that the sentencing court did not act in bad faith. (*Langhorne v. Superior Court, supra,* 179 Cal.App.4th at pp. 238–239 [question on appeal is whether evidence supports court's finding on the good faith issue].)

## B. Sufficiency of the evidence

Defendant contends that the diagnoses of paraphilia NOS and ASPS are insufficient to support the SVP commitment. He also argues that the People failed to present any evidence that he was currently suffering from a mental disorder rendering him likely to reoffend.

As in criminal proceedings, we review the record in the light most favorable to the judgment to determine whether substantial evidence supports the verdict. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–578; *People v. Mercer* (1999) 70 Cal.App.4th 463, 466 [applying substantial evidence standard of review to SVP proceedings].)

Defendant recognizes that *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1150, 1158 (*Hubbart*) has rejected his claim that the mental disorders of paraphilia NOS and ASPD are insufficient to support an SVP commitment, but argues that the decision was wrongly decided. In *Hubbart*, our Supreme Court upheld the defendant's SVP commitment on the basis of a paraphilia NOS diagnosis and rejected the defendant's due process challenge "that the SVPA must be struck down because the definition of a 'diagnosed mental disorder' does not expressly exclude antisocial personality disorders or other conditions characterized by an inability to control violent antisocial behavior, such as paraphilia." (*Id.* at p. 1158.) The Court held "due process *requires* an inability to control dangerous conduct, and does not restrict the manner in which the underlying impairment is statutorily defined," and that the SVPA meets this standard. (*Ibid.*) The court explained that *Foucha v. Louisiana* (1992) 504 U.S. 71, 74–79 was distinguishable because there, the defendant, who had been found not guilty by reason of insanity and was committed to a psychiatric facility, could no longer be confined in light of new

---

or three years in prison unless a different punishment is prescribed by law].) Although the court committed several errors in the course of its attempts to correct its earlier sentencing errors, we cannot conclude that the court's mistakes were made in bad faith.

evidence that he was no longer insane or mentally ill and posed no danger to himself or to the public. (*Hubbart, supra,* at pp. 1158–1159.) The *Foucha* court did not "state or imply that antisocial personality conditions and past criminal conduct play no proper role in the commitment determination." (*Id.* at p. 1161.)

Other courts have upheld SVP commitments on the bases of a paraphilia NOS or ASPD diagnosis. (See, e.g., *People v. Williams* (2003) 31 Cal.4th 757, 762 [paraphilia NOS]; *People v. Felix* (2008) 169 Cal.App.4th 607, 615–617 [paraphilia NOS]; *People v. Burris* (2002) 102 Cal.App.4th 1096, 1109 [personality disorder qualifies as a mental disorder under the SVPA].) We are bound by our Supreme Court's pronouncements on the issue. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Defendant argues, however, that paraphilia NOS and ASPD cannot support an SVP commitment because the disorders are not specifically identified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) (4th rev. ed. 2013).[7] This argument has been rejected by the courts. "The federal Constitution does not require an SVP's commitment to be based on a disorder that is uniformly recognized by the mental health community." (*Johnson,* 235 Cal.App.4th at p. 89; *Hubbart, supra,* 19 Cal.4th at p. 1156 [range of disorders that may support an SVP commitment not limited to those the psychiatric community defines as mental illnesses]; *McGee v. Bartow* (7th Cir. 2010) 593 F.3d 556, 576, 580 ["[C]ivil commitment upon a finding of a 'mental disorder' does not violate due process even though the predicate diagnosis [of rape paraphilia] is not found within the four corners of the DSM"].)

Defendant further contends that the SVP commitment violates his due process rights because the People failed to present substantial evidence that he *currently* suffers

---

[7] The fifth edition of the DSM was published in May 2013 and was not before the trial court. (*People v. Johnson* (2015) 235 Cal.App.4th 80, 87.) The *Johnson* court noted that "[t]he fifth edition of the DSM still references a residual category of paraphilias, noting that '[m]any dozens of distinct paraphilias have been identified and named, and almost any of them could, by virtue of its negative consequences for the individual and for others, rise to the level of a paraphilic disorder.' " (*Id.* at p. 89, fn. 13.)

from a mental disorder rendering him likely to reoffend.  Substantial evidence supports the jury's verdict.

Both Drs. Webber and Karlsson testified that defendant's diagnoses of paraphilia and ASPD were current and chronic, and that he was at risk of reoffending.  The evidence, summarized more fully above, was sufficient to demonstrate that defendant currently suffers from a mental condition that predisposes him to commit criminal sexual acts.  That defendant had not recently committed a sexually overt act was immaterial inasmuch as he had been institutionalized.  Drs. Webber and Karlsson opined that defendant's institutional behavior was not significant because he was in a controlled environment.  Webber also noted that defendant had not previously acted out sexually while in prison yet reoffended upon release.  While defendant's experts disagreed with the People's experts and opined that his risk of reoffending was mitigated by the effects of his advancing age, the resolution of the conflict in the evidence was for the jury. (*People v. Mercer, supra,* 70 Cal.App.4th at pp. 466–467 [credibility of the experts was a matter within the province of the jury].)

## C.  CALCRIM NO. 3454

Defendant contends that the court erred in instructing the jury pursuant to CALCRIM No. 3454 because the instruction confused the jury regarding the People's burden of proof.  He failed to object to the instruction in the trial court and thus forfeited the issue.  (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1236.)  We consider the argument on appeal to obviate defendant's claim that his trial counsel provided ineffective assistance by failing to object to the instruction below.

The court instructed the jury in the language of CALCRIM No. 3454 that the People must prove beyond a reasonable doubt several elements, including that defendant has a diagnosed mental disorder and, "as a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in

13

sexually violent predatory behavior."[8]  The instruction further provides that "[a] person is likely to engage in sexually violent predatory criminal behavior if there is a substantial danger, that is, a serious and well-founded risk that the person will engage in such conduct if released into the community.  [¶] The likelihood that the person will engage in such conduct does not have to be greater than 50 percent."

Defendant argues that the latter language designating a 50 percent likelihood of reoffending reflects a standard of proof that falls below a preponderance of the evidence and confuses the jury on the burden of proof.  Defendant misreads the instruction.

CALCRIM No. 3454 specifically prefaces the elements that the jury is required to find to determine that a defendant is an SVP with the instruction that the People must prove the elements beyond a reasonable doubt.  The language of the instruction is not confusing.  As explained in *People v. Hubbart* (2001) 88 Cal.App.4th 1202, in addressing similar language in CALJIC No. 4.19, the instruction "does not state or imply that the phrase 'likely that he will engage in sexually violent criminal behavior' is the standard of proof for the ultimate SVPA determination.  [Citation.]  The instruction specifies that '[p]etitioner must prove beyond a reasonable doubt that respondent currently suffers from a currently diagnosed mental disorder which prevents him from controlling his sexually violent behavior thereby making him dangerous and likely to reoffend.'  Thus, the instruction makes it clear that the jury must find *beyond a reasonable doubt* that the person is *dangerous* due to his or her mental disorder and lack of volitional control. . . . Under this instruction, any reasonable jury would be entirely capable of separating the criteria of finding it 'likely' that the person will engage in sexually violent criminal behavior from the standard of proof of 'beyond a reasonable doubt.' "  (*Id.* at p. 1233.) Here, the court also gave two additional instructions on the meaning of reasonable doubt which included the language that, "[u]nless the evidence proves each and every element of the charge beyond a reasonable doubt, you must find that the Petition is not true and

---

[8] The parties stipulated that the first element was met—that defendant was convicted of committing sexually violent offenses against one or more victims.

14

that Mr. Nelson does not meet the criteria of a sexually violent predator." (CALCRIM No. 103; see CALCRIM No. 219[9].) We must presume that the jury understood and correlated all of the instructions given to it. (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) The court's instructions were a correct statement of the law on the burden of proof for commitment of an SVP. (See *People v. Hubbart, supra*, 88 Cal.App.4th at pp. 1231–1233; *People v. Roberge* (2003) 29 Cal.4th 979, 985–988.) No additional instructions were warranted.

## D. *Circumstantial Evidence Instructions*

Defendant also argues that the court was required to instruct the jury on how to evaluate circumstantial evidence because the jury was required to rely on that evidence in determining whether the qualifying offenses occurred. The court declined to give circumstantial evidence instructions, reasoning that the jury's role was not to determine the underlying facts of the qualifying sexually violent offenses.[10]

Defense counsel conceded below that circumstantial evidence instructions need not be given, accepting the court's explanation that the case did not involve relitigation of the underlying facts of defendant's offenses, and that the role of the jury was to evaluate and weigh the credibility and testimony of the experts. Defendant has thus forfeited the issue on appeal.

In any event, the jury was fully instructed on evaluating expert testimony (CALCRIM No. 332), evaluating defendant's statements to an expert (CALCRIM No. 360), and evaluating conflicting evidence (CALCRIM No. 302). As the court explained, CALCRIM No. 332 specifically informed the jury that it was "to follow all the

---

[9] CALCRIM No. 219 provides in pertinent part: "The fact that a petition to declare respondent a sexually violent predator has been filed is not evidence that the petition is true. . . . The Petitioner is required to prove the allegations of the petition are true beyond a reasonable doubt. . . . [¶] In deciding whether the Petitioner has proved the allegations of the petition are true beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the Respondent is a sexually violent predator beyond a reasonable doubt, you must find the petition is not true."

[10] As noted, *ante*, fn. 8, the parties stipulated that these offenses occurred.

rules relating to a witness in general, but in addition, to consider the expert's knowledge, skill, experience, training, education, and the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. [And, that it] must decide whether information on which the expert relied was true and accurate, which really goes to the underlying basis of [his or her] testimony." On this record, the court did not err in its instructions.

## E. Equal Protection

Defendant further contends that his indeterminate commitment and the requirement that he prove eligibility for release by a preponderance of the evidence violates equal protection. He recognizes that our Supreme Court in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*) held that the SVPA does not contravene due process, ex post facto restrictions, or double jeopardy principles, and that we are bound by that ruling. (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d at p. 455.) He raises these arguments here to preserve the issues for federal review.

As to the equal protection challenge, the *McKee I* court held that the state "has not yet carried its burden of demonstrating why SVP's, but not any other ex-felons subject to civil commitment, such as mentally disordered offenders, are subject to indefinite commitment," and remanded the case to the trial court to determine whether the People can demonstrate constitutional justification for indefinite commitments imposed on SVP's under the SVPA. (*McKee I, supra,* 47 Cal.4th at p. 1184.) Upon remand, the trial court found that the People met their burden of justifying the disparate treatment of SVP's. The court of appeal agreed. (*People v. McKee* (2012) 207 Cal.App.4th 1325, 1347 (*McKee II*).) It concluded that disparate treatment for SVP's was warranted to further compelling state interests. (*Id.* at pp. 1347–1348.) "The People have shown that 'notwithstanding the similarities between SVP's and MDO's [and NGI's], the former as a class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society.' [Citation.]" (*Id.* at p. 1347.) Our Supreme Court denied review in *McKee II*

16

and that decision is now final.  (*McKee II*, 207 Cal.App.4th 1325, rev. denied Oct. 10, 2012, S204503.)

Defendant urges us not to follow *McKee II*, arguing that the decision is flawed because the court did not conduct a de novo review and that it misapplied the strict scrutiny standard.  As the court explained in *People v. McKnight* (2012) 212 Cal.App.4th 860, 862–864 (*McKnight*), however, *McKee II* is dispositive.  "On remand, *McKee* concluded that differences between *SVP's as a class* and other offenders justify their different treatment under the Act.  It is plain that *McKee II* is not to be restricted to Mr. McKee alone or only to those SVP's convicted of crimes against children, like him, but rather its holding applies to the class of SVP's as a whole."  (*Id.* at pp. 863–864.)  The Supreme Court denied review in *McKnight* on March 13, 2013 (S208182) and has since denied review in other cases raising the equal protection issue.  (See, e.g. *People v. Landau* (2013) 214 Cal.App.4th 1, 48, rev. denied May 22, 2013, S209450; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1079, rev. denied May 22, 2013, S208845; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1371–1372, rev. denied July 10, 2013, S210418.)  We agree with the *McKnight* court's analysis of *McKee II* and reject defendant's equal protection challenge to the SVPA.  Defendant's commitment under the SVPA does not violate his equal protection rights. (*McKnight, supra,* 212 Cal.App.4th at p. 864.)

## III.  DISPOSITION

The judgment is affirmed.

17

                                             _____

                                             Rivera, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.